UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENISE McCANN, ) | Case No. |
|     Plaintiff, ) | |
| ) | FEDERAL SECURITIES COMPLAINT |
| vs. ) | |
| ) | DEMAND FOR JURY TRIAL |
| HY-VEE, INC. ) | |
|     Defendant. ) | |

Plaintiff, Denise McCann, individually, by and through her undersigned attorney, as and for her complaint against Hy-Vee, Inc., alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters which is based on an investigation which included, among other things, the review of numerous underlying documents and sworn testimony from various hearings and depositions.

## NATURE OF THIS ACTION

1. On August 27, 2002, Plaintiff, Denise McCann, and her ex-husband, Anthony McCann, entered into an agreement terminating their divorce action. That agreement is embodied in a Decree Of Dissolution of Marriage ("Decree") that was entered by the Iowa District Court for Polk County on the same day.

2. At the time the Decree was entered, Anthony McCann was a high ranking employee of Hy-Vee, Inc. ("Hy-Vee"). One of the benefits Anthony received from his employment with Hy-Vee was the ability to purchase Hy-Vee's common stock ("Hy-Vee Stock"). By the time the Decree was entered, Anthony had acquired tens of thousands of shares of Hy-Vee Stock.

3. Hy-Vee Stock is not publicly traded and is not freely transferable.

4. The Decree awarded Denise 22,129 shares of Hy-Vee Stock. Anthony was awarded 47,543 of Hy-Vee common stock. Pursuant to the Decree, Denise was given possession of the 22,129 shares.

5. Prior to Denise's agreeing to accept the Hy-Vee Stock, Anthony and his attorney repeatedly represented to Denise and her attorney that neither Anthony or Denise could freely sell their Hy-Vee Stock. Instead, Denise or Anthony could only sell their Hy-Vee Stock under very limited circumstances. Anthony, through his counsel provided Denise with a copy of his Executive Contract of Employment, dated December 10, 2000 ("Employment Contract"), which, according to Anthony, and his attorney, identified the limited circumstances under which Anthony or Denise could sell their Hy-Vee Stock.

6. Under the Employment Contract Anthony or Denise could only sell the Hy-Vee Stock if Anthony (a) died, (b) "terminates employment" with Hy-Vee, or (c) "ceases to be employed in a position, either as store director or as an executive staff member, which entitles [Anthony] to purchase [Hy-Vee's] Common Stock."

7. Denise's attorney attempted to confirm Anthony's representations by contacting Hy-Vee's CFO, John Briggs. Mr. Briggs told Denise's attorney that Hy-Vee Stock was not freely transferable, and that Anthony and Denise could only sell his Hy-Vee Stock pursuant to the conditions set forth in Anthony's Employment Contract.

8. The representations were false that Anthony or Denise could only sell Hy-Vee Stock if one of the triggers identified in the Employment Contract occurred.

9. As a result of the false representations concerning Anthony's or Denise's ability to sell their Hy-Vee Stock, Anthony was able to: (a) convince Denise that he could

2

not make a lump sum property distribution as part of a property settlement, and (b) link his ability to sell the Hy-Vee Stock to his obligation to pay Denise alimony.

10.     Under the Decree, Anthony was obligated to pay Denise alimony. Denise was entitled to receive alimony from June 1, 2007 to August 2012 at a rate of $3,500 per month. Denise's alimony, however, would terminate during this time period if she was "able to sell her shares of Hy-Vee, Inc. as hereafter described," or when Anthony was first able to sell the Hy-Vee Stock.

11.     Shortly before the June 2007 to August 2012 alimony period began (in April or May 2007), Anthony asked Hy-Vee's CEO, Ric Jurgens, to authorize Hy-Vee's purchase of the Hy-Vee Stock that was awarded to Denise by the Decree. Anthony made this request even though none of the repurchase triggers set forth in the Employment Contract had occurred.

12.     In a letter, dated June 12, 2007, Hy-Vee informed Anthony that it was willing to purchase Denise's Hy-Vee Stock. Anthony tendered a check to Denise for the Stock in June 2007. Denise refused to accept the check and refused to sell the stock to Hy-Vee.

13.     The representations made by Anthony, his attorney and Mr. Briggs that Anthony could not sell the Hy-Vee Stock outside the trigger events described in the Employment Contract were false.

14.     Anthony commenced litigation in an effort to force Denise to surrender her Hy-Vee Stock. On September 28, 2007, the Iowa District Court For Polk County ordered Denise to turn over her Hy-Vee Stock to Anthony. Denise appealed that ruling. Denise did not turn her Hy-Vee Stock over to Anthony until January 2008.

3

15. As a result of Hy-Vee's agreeing to purchase Denise's Hy-Vee Stock at Anthony's request, Denise's alimony was terminated. Denise also incurred excessive tax obligations, significant attorney's fees to defend the lawsuit filed by Anthony concerning the sale of her Hy-Vee Stock and her subsequent litigation to have maintenance reinstated, and lost the increases in the value of the Hy-Vee Stock.

## JURISDICTION AND VENUE

16. The claims here are asserted pursuant to Sections 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

18. Venue is proper in this District pursuant to 28 U.S.C. §1391(c) because Hy-Vee does business in this district.

## PARTIES

19. Denise McCann is a private individual who acquired shares of Hy-Vee, Inc. pursuant to a divorce decree. Denise was forced to sell those shares in early 2008. Denise currently lives in Chicago, Illinois.

20. Hy-Vee is a corporation doing business in many different states. Hy-Vee is a food distributor and retailer with its principal place of business in Iowa. Hy-Vee does extensive and continuous business in Illinois. For example, Hy-Vee ships food products into Illinois and operates various retail stores in Illinois and this district.

4

## UNDERLYING FACTS

21. Denise and Anthony were married 21 years before the Decree was entered that terminated their marriage. The parties were divorced on August 27, 2002.

22. The parties had four children during the marriage. At the time of the divorce, three of the children were still minors. The parties' oldest child was attending college at that time.

23. Throughout the parties' 21 year marriage, Denise was a stay-at-home mom. Denise had not worked outside the parties' home during the course of their marriage and she had not attended college. When the Decree was entered, Denise did not have any financial or business experience.

24. Anthony was employed by Hy-Vee before the parties were married. Anthony remained employed by Hy-Vee throughout the parties' marriage.

25. On January 1, 2001, Anthony began working for Perishable Distributors of Iowa ("PDI"), which is a wholly owned subsidiary of Hy-Vee. On information and belief, Anthony became President of PDI on January 1, 2001.

26. When Anthony began working for PDI, he was also a Hy-Vee Assistant Vice President.

27. As part of Anthony's employment with Hy-Vee, he was obligated to use at least 15% of his income to purchase Hy-Vee Stock. Over the years, Anthony purchased tens of thousands of shares of Hy-Vee Stock. Hy-Vee Stock is not publicly traded and various restrictions prevented Anthony from freely selling the Hy-Vee Stock to third-parties.

28. Contemporaneously with Anthony's starting to work for PDI, Anthony signed the Employment Contract.

29. Under the Employment Contract, Anthony gave Hy-Vee the right to repurchase his shares "in the event [Anthony] dies, terminates employment with [Hy-Vee], or ceases to be employed in a position, either as store director or as an executive staff member, which entitles [Anthony] to purchase [Hy-Vee] Common Stock . . ."

30. The Employment Contract indentified the circumstances under which Anthony could sell his Hy-Vee Stock, the time frame in which Hy-Vee would have to repurchase the Hy-Vee Stock, and the minimum amounts Hy-Vee would have to purchase if it did not want Anthony to sell the shares to third parties. Specifically, if Hy-Vee did not purchase a certain amount of Hy-Vee Stock after a triggering event occurred under the Employment Contact, Anthony would then be free to sell a portion of his Hy-Vee Stock to third-parties subject to "any other restrictions applicable to said shares by contract or Articles of the corporation."

### A. Divorce Action And Settlement Agreement

31. The parties' divorce was marked by significant conflict and acrimony.

32. The parties divorce action was terminated by the Decree that contained the terms of the parties' agreements with respect to issues such as child support, alimony, division of property and custody.

33. The parties had numerous settlement discussions prior to the entry of the Decree.

34. A problem the parties had to address in their settlement discussions arose because much of the martial property the parties needed to divide was tied up in the Hy-Vee Stock Anthony had purchased over the years.

35. During a meditation session held in April or May 2002, Denise, through her attorney, had suggested that Anthony sell enough of his Hy-Vee Stock so the parties could structure a lump sum property settlement. Anthony rejected this option on the ground that he could not sell his Hy-Vee Stock.

36. Denise's attorney requested that Anthony ask Hy-Vee to purchase some of his Hy-Vee Stock so the parties could do a lump sum distribution. When asked later if Anthony had tried to sell some of the Hy-Vee Stock, Anthony's attorney stated that it was impossible for Anthony to sell his Hy-Vee Stock. Anthony's attorney tendered a copy of the Employment Contract to Denise's attorney and noted that the triggers indentified in the agreement were the only events that would give Anthony the ability to sell his Hy-Vee Stock.

37. Anthony and his attorney stated that the Hy-Vee Stock was a good investment and that Denise should not worry about getting Hy-Vee Stock instead of cash.

38. Hy-Vee increases the value of its stock by at least ½ a percent per month.

39. The representations made from Anthony and his attorney led Denise to believe that Anthony could only sell the Hy-Vee Stock if Anthony died, terminated his employment or was placed is a position at Hy-Vee that did not allow him to purchase Hy-Vee Stock (a demotion).

40. The representations made by Anthony, his attorney and Mr. Briggs, also caused Denise to believe that Hy-Vee Stock would be a suitable retirement investment.

Denise structured her agreement with Anthony on the belief that the Hy-Vee Stock she would receive would be a retirement asset.

41.     Denise's attorney attempted to confirm the representations made by Anthony and his attorney by contacting Hy-Vee's CFO, John Briggs. After the parties' mediation and before the Decree was entered, Denise's attorney called Mr. Briggs and summarized his settlement discussions with Anthony. Mr. Briggs was informed that Denise had suggested that Anthony sell some of his Hy-Vee Stock as part of a property settlement in the parties' divorce. The other option was for Denise to receive a portion of Anthony's Hy-Vee Stock.

42.     Mr. Briggs told Denise's attorney that Anthony could not sell his Hy-Vee Stock and that Hy-Vee did not purchase its stock from its employees upon demand. Mr. Briggs stated that there were no exceptions to this rule. Mr. Briggs confirmed that Anthony could only sell his Hy-Vee Stock under the conditions set forth in his Employment Contract.

43.     Based on the representations made by Anthony, his attorney and Mr. Briggs, Denise agreed to drop her request for a lump sum payout to settle the parties' divorce action. Instead, Denise agreed to accept 22,129 share of Anthony's Hy-Vee Stock.

44.     Under the Decree, Denise received from Anthony his interest in the parties' home, all of his Hy-Vee Defined Contribution Retirement Plan, $25,000 in cash, $2,500 towards her attorney fees, and 22,129 shares of Anthony's Hy-Vee Stock. Anthony retained all of the other assets, which primarily consisted of 47,543 shares of Hy-Vee Stock.

45. Based on these representations, Denise was led to believe that it was unlikely that Anthony could sell any Hy-Vee Stock for many years. Anthony was in good health at the time the Decree was entered, he had a very successful career at Hy-Vee, had worked for Hy-Vee more than 20 years, his father had worked for Hy-Vee for more than 30 years and was still friends with Hy-Vee's senior management, and Anthony had no apparent plans to retire.

46. The representations made by Anthony, his attorney and Mr. Briggs that Anthony could not sell his Hy-Vee Stock and that Hy-Vee would not purchase the stock outside the terms of the Employment Contract were false.

47. Anthony did not try to sell any of his Hy-Vee Stock prior to the entry of the Decree. Anthony knew, however, that at any time he could ask Hy-Vee's Executive Committee to purchase some or all of his Hy-Vee Stock. Contrary to the representations made to Denise and her attorney, nothing prevented Hy-Vee's Executive Committee from authorizing the purchase of some or all of Anthony's Hy-Vee Stock.

### 1. Denise's Ownership of The Hy-Vee Stock Is Linked to The Duration of the Maintenance Anthony Obligation

48. Denise was awarded residential custody of the parties' minor children, and, pursuant to the Decree, Anthony was ordered to pay child support until the "eldest child becomes 18 years of age or graduates from high school, whichever shall last occur, but in any event not later than 19 years of age, unless said child marries, dies, or becomes self-supporting sooner."

49. At the time the Decree was entered, Anthony was earning approximately $300,000.

50. Given Denise's limited formal education, lack or work experience and her inability to earn anything close to what Anthony earned, she demanded that Anthony pay her alimony. The parties agreed that Anthony would pay Denise alimony for up to 10 years.

51. Under the Decree, Anthony's alimony obligation was broken into two approximately five year obligations. The initial alimony obligation would run from the entry of the Decree (August 2002) to May 2007. During this time period, Anthony was obligated to pay Denise alimony in an amount equal to her "monthly mortgage payment, including real estate taxes and homeowners' insurance premiums, plus an additional $1,000." This obligation would remain in effect as long as Denise owned her home in Iowa. If Denise sold the home prior to May, 2007, Anthony's maintenance obligation would become $3,800 per month.

52. The May 2007 date was selected because it coincided with the expected date the Anthony's child support obligation would terminate. By this time, the parties' youngest child would have graduated from high school and would be getting ready to start college. Denise could then work full time and start the process of becoming self-supporting.

53. Up until May 2007, Anthony's maintenance obligation would terminate if (a) Denise died, (b) remarried, or (c) cohabitated with an unrelated adult man. Anthony's maintenance obligation would terminate by operation of law upon his death.

54. The second alimony period would start in June 2007 and run until August 2012. Denise and Anthony agreed that after May 2007, Anthony's alimony obligation would become $3,500 per month and continue through August 2012. Thus, Denise

would receive up to 63 months of alimony after the expected termination of the child support. The base amount of maintenance over this 63 month period, excluding any discounting or interest, totals $220,500.

55. Denise would not have the ability to significantly improve her employability as long as she was responsible for the care of the parties' minor children. The 63 months of additional maintenance was an important aspect of Denise's financial planning, because it would give her approximately 5 years to become somewhat self-sufficient.

56. During the parties' marriage Anthony had repeatedly told Denise that he would like to retire when their youngest child graduated from college. The parties' youngest child was born in December 1988, and was on track to graduate from college by 2011 or 2012. Denise, therefore, also understood that by 2012, Anthony's income and his ability to pay maintenance would likely diminish.

57. Anthony, however, requested that the 63 month alimony obligation terminate when he first became able to sell the Hy-Vee Stock. Based on the representations made by Anthony, his attorney and Mr. Briggs, Denise understood this to mean that Anthony's obligation to pay alimony would terminate if he died, lost his job with Hy-Vee or if he was demoted. If the last two conditions arose, Anthony would have the ability to request, from a court, the modification of his alimony.

58. Denise agreed to accept Anthony's request, and the Decree provided that between June 2007 and August 2012, Anthony's maintenance obligation would terminate upon Denise's "being able to sell her shares of Hy-Vee, Inc. as hereafter described," or when Anthony was first able to sell the stock.

11

59.     Denise would not have agreed to giving Anthony the unfettered right to terminate the 63 month alimony period at any time he wanted. Based on the representations made by Anthony, his attorney and Mr. Briggs concerning the marketability of the Stock, Denise did not believe Anthony had such a right.

60.     Denise relied on the statements made by Anthony, his attorney and Mr. Briggs concerning the limitations on her or Anthony's ability to sell the Hy-Vee Stock. The limitations on the sale of the Hy-Vee Stock was a material fact, because Denise would not have tied her right to receive alimony on Anthony's ability to sell Hy-Vee Stock if Anthony could at any time structure a sale of the Hy-Vee Stock.

61.     Anthony's having such a right would mean that the 63 months of alimony would never begin: Anthony would be first able to sell the Hy-Vee Stock before the 63 month period ever began.

62.     Anthony's and Hy-Vee's assurances that Anthony would not have such a unilateral right misrepresented a material fact upon which Denise relied when agreeing to the termination provision in the Decree.

### 2.     **Anthony's Attempt to Sell Denise's Hy-Vee Stock**

63.     Anthony's child support obligation to Denise terminated, as anticipated, on May 31, 2007.

64.     Shortly before the child support terminated (in either April or May 2007), Anthony asked Hy-Vee's CEO, Ric Jurgens, to have Hy-Vee purchase the Hy-Vee Stock awarded to Denise. When Anthony made this request he was PDI's President and reported to Ric Jurgens. Anthony had known Mr. Jurgens for many years, and Mr. Jurgens was a close friend of Anthony's father.

65. Anthony did not ask Mr. Jurgens to have Hy-Vee purchase any of Anthony's Hy-Vee Stock. Anthony intended to hold his Hy-Vee Stock until he either retired or his employment with Hy-Vee was terminated.

66. By June 2007, Hy-Vee had agreed to purchase Denise's Hy-Vee Stock. Hy-Vee sent Anthony a letter, June 12, 2007, stating its willingness to purchase Denise's Hy-Vee Stock.

67. Hy-Vee also gave Anthony a check for $908,174.16 to cover the price of the Hy-Vee Stock held by Denise. At that time the Hy-Vee stock was worth $41.04 per share.

68. On information and belief, Anthony deposited the check from Hy-Vee into a personal bank account. From this account he tendered a check to Denise for $708,531.06. According to Anthony, this amount represented the net value of Denise's Hy-Vee Stock minus taxes and an overpayment in maintenance to Denise.

69. Denise refused to cash the check from Anthony and refused to sell her Hy-Vee Stock.

70. As a result of Hy-Vee's agreeing to purchase Denise's Hy-Vee Stock, Anthony refused to make any alimony payments to Denise after May 2007.

71. Denise has not received any alimony from Anthony for the 63 month period starting in June 2007 and ending in August 2012. As a result, the 63 month of alimony that Denise had negotiated and relied on was a chimera.

72. Hy-Vee's purchase of Denise's Hy-Vee Stock also resulted in Denise having to pay excessive taxes on the sale. While Denise had approximately one-third of the parties' Hy-Vee Stock, she was allocated a cost basis for her Hy-Vee stock that was

13

less than 20% of the total. For tax purposes, Denise was assigned the basis on the first Hy-Vee Stock that Anthony received. This early stock had a lower price than the stock Anthony subsequently received from Hy-Vee.

73. As a result, the transaction triggered a higher tax burden for Denise than if Anthony's and Denise's Hy-Vee Stock were sold at the same time. Denise and Anthony's Hy-Vee Stock would have been sold together if the stock was sold under the terms of the Employment Contract.

74. Denise also lost any appreciation that the Hy-Vee Stock experienced after she was forced to sell her shares. By December 2008, Hy-Vee's Stock had risen to $47.85 per share. If Denise had been able to hold on to her shares until December 2008, she would have realized $1,058,872.70 on selling her Hy-Vee Stock, which is approximately $150,698 more than what she did realize on the sale.

75. On information and belief, Hy-Vee's stock has increased in value since December 2008.

### B. Litigation To Force Denise To Sell Stock

76. After Denise refused to sell her Hy-Vee Stock to Hy-Vee, Anthony filed a petition with the Iowa District Court for Polk County to have Denise held in contempt of court for refusing to give her Hy-Vee Stock to Anthony.

77. Anthony claimed that the Decree provided that Denise "shall hold stock certificates for such shares in her possession until such time as Petitioner is first able to sell these shares. At such time as Petitioner is first able to sell such shares held by [Denise], [Denise] shall release such certificates to Petitioner (for sale or redemption) . . . ."

78. An evidentiary hearing was held on September 19, 2007 on Anthony's Petition.

79. On September 28, 2007, Iowa District Court for Polk County ordered Denise to "immediately upon receipt of this order, and no later than 4:30 pm on Thursday, October 4, 2007 . . . [to] deliver to Petitioner or Petitioner's attorney the 22,129 shares (stock certificates) of Hy-Vee, Inc."

80. Denise did not deliver her Hy-Vee Stock to Anthony by October 4, 2007. Instead, Denise appealed the September 28 Order.

81. On January 15, 2008, the Supreme Court of Iowa denied Denise's petition for writ of certiorari concerning Anthony's petition.

82. On January 17, 2008, Denise executed a Release and Satisfaction acknowledging the receipt of $711,526.66 in satisfaction of her delivering the Hy-Vee Stock to Anthony.

83. Denise had to spend thousands of dollars in attorneys fees defending against Anthony's petition.

  **C.**   **Denise's Unsuccessful Efforts To Obtain Further Maintenance**

84. In 2008, Denise filed a petition with the Iowa District Court for Polk County to modify the alimony provisions contained in the Decree.

85. Denise filed this petition in an effort to restart her alimony after it ended in June 2007.

86. Anthony vigorously contested Denise's petition.

87. A two day trial was held in early January 2009. On May 4, 2009, the court dismissed Denise's Petition.

88. Denise spent thousands of dollars in attorney's fees in prosecuting her petition

## COUNT I
### (Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

89. Denise repeats and realleges each and every allegation contained above as if fully set forth herein.

90. Hy-Vee and Anthony knowingly or recklessly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Hy-Vee's and Anthony's knowing or reckless misconduct (a) deceived Denise, (b) caused her to agree to the conditioning of her right to alimony over a 63 month period on her or Anthony's the ability to sell her Hy-Vee Stock, and (c) caused her to agree to provisions in the Decree that ultimately allowed the early sale of her Hy-Vee Stock and the early termination of her alimony.

91. Anthony was a high ranking Hy-Vee executive at the time he made false and misleading representations to Denise concerning the marketability of her Hy-Vee Stock. John Briggs was Hy-Vee's CEO and a member of Hy-Vee's Executive Committee. Both knew that Hy-Vee's Executive Committee could authorize the purchase of Anthony's Hy-Vee Stock upon request.

92. Not knowing the true facts concerning the marketability of the Hy-Vee Stock, Denise agreed to accept the stock and to condition various rights she had on the restricted marketability of the Hy-Vee Stock.

93. As a direct and proximate result of Hy-Vee's and Anthony's wrongful conduct, Denise suffered damages when Anthony arranged a sale of the Hy-Vee Stock

she was awarded and: (a) her alimony was terminated, (b) she incurred substantial legal fees addressing Anthony's efforts to complete the sale and her subsequent effort to have the alimony reinstated, (c) had to pay extra taxes because Anthony did not sell any of his Hy-Vee Stock, and (d) she lost the appreciation in value experienced by Hy-Vee's stock after the sale.

94. By reason of the conduct alleged herein, Hy-Vee knowingly or recklessly have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated hereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment against Hy-Vee as follows:

A. Requiring Hy-Vee to pay damages sustained by Denise by reason of the acts and transactions alleged herein;

B. Awarding Denise post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

C. Awarding such other and further relief as this Court may deem just and proper.

## Demand for a trial by jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Denise hereby demands trial by jury of all issues that may be so tried.

LAW OFFICES OF GEORGE M. SANDERS, P.C.

By: /s/ George M. Sanders
George M. Sanders
Law Offices of George M. Sanders, P.C.
150 N. Michigan Avenue, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 624-7645
Facsimile: (312) 634-7701
Dated: September 22, 2009